# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00387-CV

---

**T. D., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-19-006187, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

T.D. (Mother) appeals from the trial court's termination decree following a bench trial.[1]  The trial court determined that Mother knowingly placed or allowed her children to remain in conditions that endangered their well-being and determined that termination of Mother's parental rights was in the best interests of two of her children.  On appeal, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's best-interest and endangerment determinations regarding the two children for whom the parent-child relationship was terminated.  We will affirm the trial court's termination decree.

---

[1] To protect the children's privacy, we will use pseudonyms when referring to them and will refer to family members by their relationships to the children.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  Although the parental rights of the fathers were also terminated, they are not parties to this appeal.

**BACKGROUND**

After receiving complaints regarding Mother's parenting, the Texas Department of Family and Protective Services (Department) took custody of her five children: Lisa, John, Leon, Lucy, and Sam. After investigating the case for months, the Department changed its recommendation from reunification to termination. The case involving Lisa, who was fourteen years old at the time of the hearing, was severed from the case involving her four younger siblings. At the time of the termination hearing, the four younger children were the following ages: John eleven, Leon ten, Lucy nine, and Sam eight. The trial court ultimately terminated Mother's parental rights to Leon and Sam but not to John and Lucy.

Before the present case, the Department received complaints regarding Mother's parenting, which resulted in investigations by the Department in 2014, 2016, and early 2019. In 2014, the Department received multiple reports alleging, among other things, that Mother's former boyfriend, who was father to some of her children, sexually abused Lisa, who was seven years old at the time. This allegation was not ruled out. When the case was closed, Mother accepted voluntary services through Family Based Safety Services.

In 2016, the Department again became involved after receiving a referral stating that Mother left her children in the care of a friend and that the children were later found in the woods. As a result of the complaint, the Department was granted temporary conservatorship of the children. The Department determined that there was reason to believe that Mother had neglectfully supervised the children; however, the children were returned to Mother's custody after Mother completed the services recommended by the Department. In early 2019, the Department opened another investigation for allegations pertaining to John.

In August 2019, the Department received a referral alleging, among other things, that Mother allowed Lisa to smoke marijuana and that Mother was using drugs, which led to the present investigation and suit. When the Department reached out to Mother, Mother admitted to hiding marijuana in her bedroom and smoking it while the children were asleep and to using methamphetamine and cocaine a few months before the investigation started.

The children were removed from Mother's custody, and the Department was named as their temporary managing conservator. As part of her services in this case, Mother was required to participate in a psychological evaluation; substance-abuse assessments; random drug tests; individual therapy focusing on parenting, substance abuse, and domestic violence; a protective parenting program; and a psychiatric evaluation. Mother was also required to provide monthly verification of her attendance in Narcotics Anonymous meetings and follow the recommendations of the referred psychiatrist. As part of the evaluation, the psychiatrist recommended that Mother seek treatment from a mental-health hospital, complete an outpatient substance-abuse program, and attend regular Narcotics Anonymous meetings.[2]

After the children were removed from Mother's care, they were placed in foster care and other care facilities during the pendency of the case. In their first placement, the children were placed with a maternal relative, but John and Leon were subsequently moved to a therapy-and-foster home after the relative expressed concerns about their behavior. Lucy, Lisa, and Sam were later removed from their first placement and then housed in a shelter for a few months before they were placed in July 2020 in a foster home belonging to Foster Mom and Foster Dad, where the children resided for the remainder of the case. Lisa and Foster Mom had a

---

[2] During the hearing, multiple exhibits were admitted into evidence showing the requirements that were added throughout the case.

preexisting relationship because Foster Mom had been Lisa's teacher. John and Leon were moved to various placements before being transferred to a general residential operation so that they could be more closely monitored. While John and Leon were in this new housing center, Foster Parents underwent additional training to provide "moderate and specialized level[s] of care" to allow John and Leon to move into their home with their siblings, and John and Leon moved into Foster Parents' home in March 2021, which was a few months before the hearing at issue.

During the termination hearing, the following witnesses testified: the Department investigator, the Department caseworker, a clinical psychologist, the therapist for several of the children, Lisa's counselor, Foster Mom, the Court Appointed Special Advocate (CASA) for the case, Mother, Mother's parenting coach, the Department visit supervisor, and Mother's counselor. The Department's investigator testified that Mother admitted to smoking marijuana at the home and keeping marijuana in her bedroom, to using methamphetamine in 2018 and 2019, and to using cocaine more recently. The investigator recommended that the children live somewhere else because of Mother's history of drug use and because of the other earlier investigations involving allegations of sexual abuse of Lisa, neglectful supervision, and placement of the children with inappropriate caregivers. During the investigation, Mother suggested several individuals as placement options for the children, but the investigator explained that the Department did not approve any of those because of the individuals' criminal histories or previous involvement with the Department. Similarly, the investigator explained that the other adults who Mother had allowed to supervise the children in the home, including Mother's romantic partner, had criminal histories or prior involvement with the Department.

4

The caseworker assigned to this case testified that Mother did complete some of the court-ordered services. For example, the caseworker stated that Mother visited with her children, submitted to a psychological evaluation, and completed substance-abuse assessments in 2019 and in 2020. Additionally, the caseworker acknowledged that those assessments did not recommend substance-abuse treatment but explained that those assessments were based on self-reported behavior and that Mother had "a history of using illegal substances."

The caseworker related that Mother did not complete all of her required services. More specifically, the caseworker stated that Mother did not complete outpatient treatment for substance abuse or psychiatric treatment and did not consistently provide verification for her attendance at Narcotics Anonymous. The caseworker testified that Mother denied ever using any drugs, had not taken responsibility for her past drug use that initiated this case, and failed to demonstrate her sobriety despite the dismissal deadline in this case having been extended multiple times. In addition, although Mother did enroll in individual and other types of therapy and did attend various trainings, Mother had not been discharged from parenting coaching or individual therapy. Although the Department initially recommended unsupervised visitations, that changed after Mother had a positive drug test, and the caseworker related that Mother accused her of falsifying the test results. Mother again tested positive for illegal drugs in April 2021.

In her testimony, the caseworker discussed how Mother's suggestions regarding who should care for the children were rejected because of the Department's concerns, including concerns about some of the individuals' criminal histories. Moreover, the caseworker related that Mother has a long history with the Department and that the children had been removed from Mother's custody before. Although the caseworker acknowledged that Mother had completed services in those prior cases, which were either closed or dismissed, the caseworker testified

5

that Mother repeated behavior warranting Department intervention in this case. The caseworker testified that this pattern concerned her, particularly since all of the children have been removed from Mother's custody twice, because the required services were designed to show Mother how to handle family situations so that the Department did not have to become involved again and because Mother was not applying the parenting lessons that she had been taught before this case.

When discussing the children, the caseworker explained that Sam often opts out of visits with Mother because he is afraid of her. Additionally, the caseworker testified that it was in Sam's best interest for Mother's parental rights to be terminated and for him to be adopted by Foster Parents. When discussing Leon, the caseworker acknowledged that his placement has had "ups and downs" as he adjusted to a less restrictive environment. Further, the caseworker discussed how Leon had never been placed in a mental-health hospital before living with Foster Parents but that they placed him in one after he reported seeing and hearing things that were not there. Additionally, the caseworker related that Leon is in outpatient mental-health treatment and requires a higher level of care. However, the caseworker related that Leon's placement with Foster Parents is stable because Foster Parents were helping him get the treatment that he needed to keep him and others safe and because Foster Parents had received additional training to provide "moderate and specialized level of care" so that Leon and John could move into their home. In addition, the caseworker related that Leon was displaying the symptoms that resulted in his hospitalization before he moved in with Foster Parents. Further, the caseworker stated that Foster Parents' home was a good one for Leon to live in, that he was getting everything that he needed there, and that now he can discuss his prior trauma and process those events because he feels safe.

Regarding Foster Parents, the caseworker related that they were doing a good job of providing age-appropriate supervision for the children and that the children are comfortable with them, spend time with them, and engage in activities with them. Further, the caseworker discussed how Foster Parents were interested in fostering all of the children.

During the hearing, the clinical psychologist to whom Mother had been referred in this case testified that she completed a psychological evaluation of Mother in October 2019. Regarding her assessment, the psychologist explained that Mother had been diagnosed with schizophrenia when she was thirteen years old and had post-traumatic stress disorder, a history of depression, "symptoms of psychosis," a substance-abuse problem, a history of "suicidal ideation and self[-]injury," and symptoms of a "borderline personality disorder," including mood instability and anger issues. Further, the psychologist related that Mother needed to see a psychiatrist to be properly medicated but had not sought mental-health treatment. Additionally, the psychologist testified that Mother's mental-health issues could affect her parenting if untreated. The psychologist also expressed concern regarding the Department's previous investigations and the children's prior removal from Mother's custody, explaining that if a parent continues to behave in a manner that causes the Department to repeatedly become involved, that seems like "a pattern that's going to repeat within the home." The psychologist recommended that Mother's visits with her children be supervised and that she attend parenting classes and domestic-abuse education.

Regarding Mother's history of drug use, the psychologist explained that Mother began smoking marijuana when she was a teenager, smoked marijuana daily until stopping when the children were removed from her custody in this case, tried methamphetamine three or four times in the past, and tried cocaine. The psychologist recommended that Mother submit to

7

ongoing drug testing and a substance-abuse assessment to determine if outpatient or inpatient services should occur. Further, the psychologist explained that substance-abuse issues can affect someone's ability to be an effective parent because it may lead to the parent not watching the children closely enough or allowing the children to be around inappropriate things. Similar testimony regarding Mother's psychological diagnoses and regarding Mother's admissions about her drug use were presented through the psychiatrist to whom Mother was referred. However, the psychiatrist also testified that Mother admitted to using methamphetamine three times a week in her bedroom away from her children.

Turning to Mother's romantic relationships, the psychologist explained that the father of three of Mother's children was "very controlling" and "sexually abused" Lisa. The psychologist also stated that Mother's most recent relationship was also with a controlling man who limited her social support system. The psychologist's report was admitted into evidence and documented that Mother admitted to being involved in abusive relationships, including one in which the abuser assaulted her and caused her to miscarry.

The psychologist testified that she interviewed several of Mother's children as part of the assessment and further related that one of the children discussed how Mother's boyfriend would show up to their house and shake the doors and windows while attempting to enter the house without permission, which resulted in the children having to sleep in the living room. Regarding Lisa, the psychologist testified that, among other things, Mother physically and psychologically abused Lisa, forced Lisa to watch Mother have sexual intercourse, and gave Lisa marijuana to smoke. The psychologist diagnosed Sam as suffering from post-traumatic-stress disorder, which resulted in his having a heightened startle response. The psychologist also testified that Sam has nightmares and traumatic memories. Sam told the psychologist that

8

Mother hit him with "a switch or a belt and left marks on him" and that he witnessed domestic violence between Mother and her boyfriend.

Following the psychologist's testimony, the therapist for John, Leon, Lucy, and Sam who began treating the children in September 2020 testified. The therapist explained that Sam reported that Mother physically abused him, which has resulted in his having frequent nightmares. The therapist related that Sam's behavioral issues stem from his prior trauma and that his behavior and performance in school are improving because he is now processing his prior trauma in therapy. Given the abuse that Sam described, the therapist was concerned about his returning to Mother's care.

Regarding Leon, the therapist testified that he discussed "extensive hitting" by Mother that went beyond spankings, expressing fear when discussing those incidents. For example, Leon revealed that Mother would tell him in front of Department employees that he and Mother would get ice cream or do another fun activity when the employees left but would instead hit him when the employees left. The therapist revealed that Leon's past trauma makes it difficult for him to trust adults and that he now equates an adult's anger with being hit. The therapist expressed concern about Leon being returned to Mother's custody given the abuse that he described. Additionally, the therapist revealed that Leon initially had a hard time adjusting to Foster Parents' rules after having lived in a shelter for so long. In her testimony, the therapist discussed how Leon was hospitalized after moving in with Foster Parents for hearing voices, experiencing visual hallucinations, and indicating that he might harm himself but said he had been released and was currently in "intensive outpatient" treatment. Additionally, the therapist revealed that Leon is now taking medication to treat his mental-health issues.

9

The therapist testified that Leon, Lucy, and John all expressed a desire to live with Mother. However, the therapist also said that it is not uncommon for children to express a desire to return to an abusive parent because of their love for the parent and because they might not know any better. Regarding this case, the therapist stated that the children's desires might also be motivated by a desire to return to an environment with fewer rules than Foster Parents'.

Regarding Foster Parents, the therapist testified that they seek her advice on how to help with the children and that they drive the children to their activities and doctor's appointments. In addition, the therapist described Foster Parents as "caring and attentive" and discussed how they gave each child "individual time." The therapist testified that Foster Parents are providing for the children's medical, educational, and emotional needs; providing a loving environment for all five children; helping the children to develop coping mechanisms; applying appropriate discipline techniques; and giving the children a structured and supportive living environment, which has benefitted all of the children and will allow them to continue to improve. The therapist recommended that Foster Parents adopt all of the children if that was an option.

When called to the stand, Lisa's counselor testified about acts of abuse by Mother that Lisa discussed during therapy, including one incident where Mother "beat" Lisa "with a belt on her back," causing her back to bleed.

During the hearing, Foster Mom testified regarding her experience fostering the children. Foster Mom explained that she is a schoolteacher, obtained a foster-parent license to foster Lisa, wanted to keep all of Lisa's siblings together, and offered to foster all of them. Additionally, Foster Mom related that the children will flinch if she is close to them and talks while using her hands, which she described as an unusual reaction. Further, Foster Mom stated that all of the children are now in therapy, that she makes an effort to spend individual time with

10

each of them to develop her relationships with them, that she engages in activities with all of the children, that the children are all now taking medicine needed to address their mental-health issues, and that she and her husband were willing to provide extra support for the children's mental health if it is needed. Moreover, Foster Mom testified that the children have bonded with each other after moving into the same house. Additionally, Foster Mom related that the children have nicely decorated rooms with toys and electronic devices. Foster Mom also testified that she loved the children and wanted to adopt all of them or serve as a long-term placement if they did not want to be adopted.

Foster Mom testified that Sam described Mother as abusive and neglectful and said that Mother would "have him lay in the bed while she was having sex with . . . two different men on two different occasions." Foster Mom related that Sam stated that he did not like Mother's behavior and that Sam's remembering this sexual behavior has affected his behavior at school. Moreover, Foster Mom described how Sam stated that he did not want to live with Mother because she would "beat" him and discussed smoking marijuana with Mother while in her custody. Regarding Leon, Foster Mom testified that he struggled when he first moved in because he was not used to the home's rules but that she helped him with the transition by explaining what was expected of him. Foster Mom also described some concerning behavior from Leon where he became upset in his room, continued to cry for several minutes, stated that he wanted a hug, and screamed, "[p]lease don't hit me," when she approached him. Additionally, Foster Mom testified that Leon has been taken to a mental-health hospital twice while in her custody, that the first hospitalization occurred after Leon stated that he was seeing someone who was not there and who told him to commit suicide, that she took Leon to the hospital because she was afraid that he might hurt himself, and that his medication was changed

11

after he was hospitalized. Foster Mom related that Leon is currently in intensive outpatient therapy and that she and her husband will make Leon's mental health a priority by ensuring that he completes the outpatient therapy and then placing him back with his regular therapist and a psychiatrist. When discussing Lisa, Foster Mom stated that Lisa discussed how Mother forced her to take photos of Mother naked and how Mother drank alcohol and smoked marijuana with the children.

Following Foster Mom's testimony, the CASA for the children testified that she met the children in 2016 as part of an earlier investigation when the Department became their temporary conservator. The CASA explained that the earlier case was closed in 2017 and that she was in favor of reunification in that case because Mother had completed all of her services and appeared stable and because the children wanted to go home.

Regarding the current case, the CASA explained that she is not in favor of reunification even though Mother had achieved stability in her employment and completed her required services. When explaining her change in position, the CASA stated that Mother poses a risk of endangerment to the children, does not appear to have overcome her history of drug use, exhibits current behaviors indicating "that she has not successfully . . . obtained appropriate parenting skills," refuses to accept any responsibility for the case, and blames Lisa for the Department's investigation. The CASA also expressed concern that Mother was coaching the children to say that they wanted to live with her and enticing the children with the promise of gifts if they were returned to her home.

The CASA acknowledged that there had been no complaints regarding Mother during her unsupervised visits with the children, that the children reported having a good time during those visits, and that she had no concerns about the children's safety based on their

12

descriptions of the visits. However, the CASA recommended that Mother's parental rights be terminated and expressed that termination was in the children's best interests because Mother exhibited behavior during the pendency of the case endangering the children, will be unable to meet the medical and psychological needs of the children, exposed the children to inappropriate caregivers, and recommended "inappropriate" or "outright dangerous" potential placements for the children. Moreover, the CASA related that Mother has a history of behaving violently towards the children, involving the children in illegal drug use, exposing the children to sexual behaviors that is reflected in the children's subsequent behavior, and being in abusive relationships. The CASA testified that all but one of the children described observing domestic abuse in the house.

When discussing Sam, the CASA related that he said that Mother "hit him in his no-no zone" while he was not wearing any clothes and pointed to his genitals and "his bottom" during this description. Regarding one incident, the CASA testified that Sam described Mother hitting him with such force that it caused his hands to move from the table and described how Mother hit him multiple times in response to him moving his hands. The CASA described these actions as "physical abuse of a child" based on her training. The CASA testified that Sam is afraid of Mother, smoked marijuana while living with Mother, witnessed Mother having sexual intercourse, and does not want to live with Mother because of the physical abuse that he suffered previously.

Concerning Leon, the CASA related that he has repeatedly changed his mind regarding whether he wanted to live with Mother or with Foster Parents. Although the CASA agreed that Leon had been hallucinating while living with Foster Parents and had never been placed in a mental-health facility before living with them, she also stated that Leon had those

13

symptoms before this placement and that his hospitalization seemed appropriate given that he reported hearing voices telling him to hurt himself. In addition, the CASA testified that Leon may develop more mental-health issues in the future.

The CASA explained that she had no concerns about the children's safety with Foster Parents because they provide a stable home and take care of the children's behavioral needs. The CASA also had no concerns about Foster Parents taking Leon to a mental-health hospital because he needed help. Additionally, although the CASA acknowledged that the children are bonded with Mother, she also stated that the children are bonded with and love Foster Parents.

Next, Mother testified that she has lived in the same home for several years and has consistently been employed. However, Mother admitted that she began using marijuana when she was fourteen years old, was using marijuana a couple of times a week before this case started, started using methamphetamine in 2018, told the psychiatrist that she used methamphetamine three times a week until a few months before the Department initiated this case, was using cocaine when this case began, had used cocaine before a prior investigation by the Department, and had been in a physically abusive relationship for several years with a man who sexually abused Lisa. Although Mother testified that she had been attending Narcotics Anonymous meetings weekly, she admitted that she does not always provide proof of her attendance and has not participated in any sort of drug-rehab program. Mother also explained that her visits with her children in this case became supervised after she tested positive for drugs.

Mother denied having sexual intercourse in front of the children, having Lisa take photos of her naked, and giving her children drugs. Further, Mother testified that she will protect her children by not placing them in situations where there is physical or sexual abuse

14

and by focusing on their individual needs. Mother also related that she brings arts and crafts for the children during her visits, that the children say that they love and miss her, that she spends individual time with the children, and that she hugs them and tells them that she is there for them.

Mother's parenting coach testified that she has been Mother's coach for a year and that she has attended some of Mother's visits with her children. The coach stated that Mother's home was safe and appropriate and that the children's bedrooms were appropriate and had all the items that they needed. In addition, the coach related that Mother was receptive to parenting suggestions, makes efforts to implement those suggestions, has improved her awareness of her children's needs and ability to meet those needs, has demonstrated the ability to manage parenting multiple children while giving each child individual attention, has practiced her parenting skills, and has been consistently employed. When describing Mother's visits with her children, the coach explained that Mother feeds the children, brings arts and crafts for the family to work on as suggested, keeps them protected, and meets their emotional needs, and the coach stated that the children were comfortable talking with Mother. When discussing Leon, the coach said Mother would address his emotional needs by hugging him and exchanging affection and commented that they seemed to enjoy each other's company. Addressing Sam, the coach explained that Mother met Sam's needs and talked with him about disputes that he had with his siblings until he felt comfortable interacting with his siblings again. In addition, the coach described Mother as demonstrating an interest in being involved with her children and placing "their interests at the forefront." Moreover, the coach stated that she has no concerns about the children being returned to Mother's care and did not think her parental rights should be terminated.

15

However, the coach also admitted that Mother did not discuss her drug use or her positive drug-test results during the pendency of this case, that Mother did not discuss prior incidents where the children had been endangered by people that Mother allowed to supervise them, and that she would have concerns if Mother relapsed but did not seek treatment. Similarly, the coach admitted that Mother did not mention using corporal punishment on her children or her children using marijuana or drinking, and the coach agreed that Mother may have been minimizing the ways in which the children had previously been endangered. The coach also admitted that she was only present for three or four of Mother's visits with her children and that Mother knew that she was being observed during those visits.

Following the coach's testimony, a visit supervisor for the Department testified that she had also observed some of Mother's visits with the children. The supervisor stated that she had no concerns about Mother keeping the children safe, that the children are happy to see Mother, that Mother embraces her children, that Mother meets the children's emotional needs during the visits, that Mother individually attends to the children's needs, and that there is a strong and loving bond between Mother and her children. However, the supervisor admitted that she had only observed five of Mother's visits with her children.

Finally, Mother's counselor testified and explained that she had worked with Mother since October 2019, that Mother presented with symptoms of depression and anxiety, and that Mother had a history of substance abuse. Further, the counselor related that Mother "no longer has a pattern of abuse in terms of substances," has developed coping techniques to deal with her depression and anxiety, and shows fewer signs of depression and anxiety. In addition, the counselor explained that Mother has been working on being a nurturing parent and has been learning how to address the mental health needs of her children. Moreover, the counselor stated

that she did not have any concerns about Mother not being protective of her children. However, the counselor admitted that she had never observed Mother interacting with her children. Although the counselor admitted that Mother tested positive for drugs in December 2020, the counselor testified that she had not observed any current pattern of drug abuse.

After the witnesses finished testifying, the trial court individually met with John, Lucy, Leon, and Sam and subsequently explained to the parties that an important component of the best-interest determination for children their ages is whether the child desires to live with the parent. Next, the trial court stated that John and Lucy want to live with Mother. Regarding Sam and Leon, the trial court related that they both want to live with Foster Parents and that Sam wants this outcome even if that means he no longer lives with all of his siblings. During that hearing, the trial court instructed that the siblings should have regular visits with one another even though they will be living in different homes.

Following the conclusion of the hearing, the trial court issued two orders. The first order concerned John and Lucy, and the trial court determined that Mother knowingly placed or allowed John and Lucy to remain in conditions or surroundings that endangered their well-being but that it was not in their best interest to terminate Mother's parental rights. The second order concerned Sam and Leon, and the trial court made the same endangerment determination but also concluded that it was in their best interest to terminate Mother's parental rights.

Mother appeals the trial court's order terminating her parental rights to Sam and Leon.

## STANDARD OF REVIEW AND GOVERNING LAW

To terminate an individual's parental rights, the Department must prove by clear and convincing evidence that the parent engaged in conduct listed as a statutory ground for termination in the Family Code and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. When reviewing a termination order, appellate courts defer to the factfinder, who, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

In legal-sufficiency reviews, appellate courts consider undisputed evidence contrary to the finding at issue but assume that the factfinder resolved disputed facts in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 630-31 (Tex. 2018). The evidence is legally sufficient "if, viewing the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. In contrast, for factual-sufficiency reviews, appellate courts weigh the disputed evidence contrary to the finding against the evidence supporting the finding and ascertain whether a reasonable factfinder could have weighed the conflicting evidence in favor of the finding. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

18

In her first issue on appeal, Mother contends that the evidence was legally and factually insufficient to support the trial court's best-interest determination for Sam and Leon. In her second issue on appeal, Mother asserts that the evidence is legally and factually insufficient to support the trial court's endangerment determination.

**Best Interest**

The best-interest prong "is child centered and focuses on the child's well-being, safety, and development." *Id.* This determination is guided by multiple non-exclusive factors, including the following: (1) the child's wishes; (2) the child's physical and emotional needs; (3) the physical and emotional danger to the child now and in the future; (4) the parental ability of the person seeking custody; (5) programs available to help that person; (6) the plans for the child by that person or the agency seeking custody; (7) the stability of the home; (8) the parent's acts or omissions indicating that the parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Evidence pertaining to a statutory ground for termination may also be probative of the best-interest prong. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). The Department need not prove all the factors, and the absence of evidence for some of the factors does not preclude a finding that termination is in the child's best interest. *Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

*The Children's Wishes*

In her brief, Mother urges that this factor should weigh in her favor because the children had consistently expressed the desire to live with her and that Leon's change of mind

during trial should not be given much weight. However, the trial court explained that it met with each child individually to ascertain their wishes and that it gave great weight to their desires. Although those interactions were not transcribed and although the record does not establish the types of questions the trial court asked to determine if the children had "sufficient maturity" to express their preferences, *see In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied), we presume based on the trial court's explanation that it considered the children's wishes and that it determined that the children were sufficiently mature, *cf. Campbell v. Hart*, 256 S.W.2d 255, 259 (Tex. App.—Fort Worth 1953, writ ref'd n.r.e.) (explaining that in absence of record, appellate courts "presume the regularity of the actions of [trial] court"). As set out above, both Leon and Sam expressed to the trial court their desire not to be returned to Mother.[3]

*The Children's Physical and Emotional Needs and Current and Future Danger to those Needs*

In her brief, Mother notes that none of the children had any physical health issues and argues that the Department did not establish any physical danger to the children after she learned proper parenting techniques during her required services. Further, Mother argues that Foster Parents were unable to care for Leon's mental health because they had to place him in a mental-health hospital in the short time that he lived with them and highlights that he had never been hospitalized prior to his placement with them. Mother also highlights that the children's

---

[3] On appeal, Mother notes that approximately two months after the trial court signed the termination decree, the attorney ad litem for Leon filed a motion to change Leon's placement because he had been placed in a mental-health hospital again and then placed in a therapeutic foster home and because Foster Parents "gave a 24-hour discharge notice" regarding Leon's placement with them. Further, the attorney ad litem explained that Leon now desires to live with Mother because she understands him and because Foster Parents do not. However, no evidence regarding these events was before the trial court when it terminated Mother's parental rights. *Cf. In re T.L.B.*, No. 01-21-00081-CV, 2021 WL 3501545, at *10 (Tex. App.—Houston [1st Dist.] Aug. 10, 2021, pet. denied) (mem. op.) (explaining that reviewing courts "must limit [their] review to the trial evidence" when considering appeal of termination decision).

therapist agreed to continue to work with them if they were returned to her care. Additionally, Mother points to the testimony from her parenting coach and therapist who both stated that she was aware of her children's emotional needs and to the testimony from her parenting coach and from the Department's visit supervisor who discussed how Mother handled the children's emotions individually and as a group.

As Mother points out, the evidence did establish that Foster Parents placed Leon in a mental-health hospital, that he was placed in intensive outpatient therapy following his release, and that he had not been placed in those types of programs before living with Foster Parents. However, the children's therapist and the caseworker specified that Leon is now receiving the mental-health treatment that he has needed, and the CASA described the placement in the mental-health hospital and outpatient treatment as appropriate given his symptoms. The children's therapist explained that Sam and Leon's prior trauma from living with Mother caused them to have mental-health issues, and the therapist related that Sam experiences nightmares and behavioral issues because of the abuse but that he has improved since living with Foster Parents. The psychologist to whom Mother was referred testified that Sam has post-traumatic-stress disorder. The CASA testified that Mother would be unable to meet the children's medical and psychological needs and warned that Leon's issues could get worse and require additional treatment in the future. Multiple witnesses testified that Mother placed or suggested placing the children in the custody of individuals who were inappropriate caregivers before and after the children were removed from her home.

Additionally, evidence was presented regarding Mother's history of substance abuse and mental-health issues, which the psychologist testified could affect her parenting abilities if not properly treated, and Mother admitted to regularly using illegal drugs, including

21

methamphetamine, cocaine, and marijuana, in her home while her children were present. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (noting that parental drug use is relevant to best-interest determination); *In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.) (noting that evidence of "continued drug use . . . demonstrates an inability to provide a stable environment for [child] and an inability to provide for his emotional and physical needs").

Furthermore, evidence presented during the hearing established that Mother tested positive for illegal drugs after the children were removed from her care. *See D.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00255-CV, ___ S.W.3d ___, 2021 WL 5098308, at *5 (Tex. App.—Austin Nov. 3, 2021, no pet. h.) (noting that "this and numerous other courts of appeals have recognized that a parent's decision to use illegal drugs while the termination suit is pending, and the parent is at risk of losing her child, may support a finding of endangering conduct"); *In re M.A.J.*, 612 S.W.3d 398, 407-08 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (determining that evidence of positive drug tests after receiving referral that parent used narcotics was sufficient to support finding of endangerment); *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (explaining that evidence that parent engaged in drug use during pendency of termination suit when parent is at risk of losing child can be sufficient evidence to support endangerment finding); *see also In re M.G.D.*, 108 S.W.3d 508, 513, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (noting that "evidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue" and that narcotics-abuse issues "sometimes reappear").

Moreover, during the hearing, Mother admitted that she had been in an abusive relationship for years with the father of three of her children. *See In re S.K.A.*, 236 S.W.3d 875,

22

903 (Tex. App.—Texarkana 2007, pet. denied) (explaining that history of abuse in child's family is relevant to best-interest analysis). The psychologist testified that Mother's most recent romantic partner was controlling and limited Mother's social support system. The psychologist also explained that Sam observed domestic abuse between Mother and her boyfriend near the time of his removal, and the psychologist described incidents in which the current boyfriend attempted to break into the home, forcing the children to sleep in the living room away from the doors and windows. In addition, evidence was presented showing that the children had been removed from Mother's custody before this case after she placed the children in the care of someone who did not supervise them properly, resulting in the children later being found in a wooded area.

*Mother's Parental Abilities and Programs Available to Help Her*

When addressing the fourth and fifth factors, Mother highlights the testimony from her counselor, her parenting coach, and the Department's visit supervisor discussing how Mother implemented parenting suggestions, practiced her nurturing skills, met the children's emotional needs during visits with the children, protected her children during their visits, stopped her pattern of substance abuse, learned coping techniques to deal with her mental-health issues, learned how to address her children's mental-health issues, and improved her awareness of her children's needs, her ability to meet those needs, and her ability to manage multiple children. Further, Mother emphasizes the services that she completed in this case, including submitting to psychological and psychiatric evaluations, drug testing, and substance-abuse evaluations that did

not recommend treatment, and attending parenting coaching, domestic-violence classes, nurturing parenting classes, scheduled visits with her children, and Narcotics Anonymous meetings.[4]

However, evidence was also presented showing that the parenting coach, visit supervisor, and Mother's counselor had either observed only a few or no visits between Mother and her children. Moreover, Mother did not disclose to her parenting coach her drug use during the pendency of this case, the prior endangerment allegations from previous cases initiated by the Department, or any acts of physical abuse against her children, and the coach agreed that Mother may have been downplaying how much the children had previously been endangered.

---

[4] In her brief, Mother points to several cases in which our sister courts of appeals have determined that the evidence was insufficient to establish that termination was in the children's best interest where the parents had made significant improvements after the children had been removed from their custody; however, we believe those cases are distinguishable. *See, e.g.*, *In re C.A.M.*, 633 S.W.3d 68, 78-80 (Tex. App.—Amarillo 2021, no pet.) (reversing best-interest determination where evidence showed, among other things, that caseworker did not testify that termination was in children's best interest, that abusive father was "substantial[ly to] blame" for children's removal rather than appellant (mother), and that appellant turned her life around and complied with requirements of service plan); *In re S.R.L.*, 243 S.W.3d 232, 234, 236 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (reversing termination on best-interest grounds in case where father had committed crime resulting in his incarceration but where trial court indicated that it wanted to allow father to be in children's life and that father had never "done anything bad" to children, where there was "substantial and uncontradicted evidence that he has turned his life around" after attending anger management classes and completing all portions of service plan, and where father had home and family support in place); *In re W.C.*, 98 S.W.3d 753, 766 (Tex. App.—Fort Worth 2003, no pet.) (reversing on best-interest ground where "the evidence is uncontradicted that appellant has done everything the Department required of her," where appellant had made significant improvements in her life and in her coping skills, and where record showed that appellant could not have done anything more to have her children returned). In this case, there was evidence that Mother did not fully comply with her service plan and tested positive for drug use after the children were removed, that the Department had removed the children from her custody for endangering her children before the investigation in this case, that Mother physically abused Sam and Leon, that the trauma Sam and Leon experienced while living with Mother caused them to have mental-health issues, and that Mother gave Sam illegal drugs and had sexual intercourse in front of him more than once. Additionally, witnesses testified that terminating Mother's parental rights was in the children's best interest.

In addition, the Department caseworker explained that the substance-abuse assessment was based on self-reported behavior and described Mother's long history of drug use. The caseworker also testified that Mother did not complete the psychiatric treatment or outpatient substance-abuse treatment that had been recommended by the psychiatrist and required by the Department and did not provide consistent verification of her attendance at Narcotics Anonymous meetings. Further, the caseworker emphasized that Mother has not been discharged from parenting coaching or individual therapy. Moreover, the psychologist and psychiatrist to whom Mother was referred both testified regarding Mother's multiple mental-health diagnoses. *See In re R.J.*, 579 S.W.3d 97, 118 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (explaining that "the impact of a parent's mental illness on his ability to parent and the stability of the home are relevant factors in the best interest" analysis).

Further, the caseworker discussed how Mother had completed services in prior Department cases, including one where her children were removed from her custody, but still engaged in the behavior initiating the current case. Similarly, the psychologist to whom the Department referred Mother and the caseworker explained that the Department's prior removal of the children was concerning because when a parent repeats behavior that causes the Department to repeatedly become involved, the pattern is likely to repeat if the children are returned to the parent's care. *Cf. In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (explaining that "trier of fact may measure a parent's future conduct by his past conduct" in best-interest determination). The psychologist also explained that substance-abuse issues can affect the ability of someone to be an effective parent by resulting in the children being improperly supervised or exposing the children to drugs. The CASA explained that she was in favor of reunification in the prior case in which the children were removed but

25

that she changed her mind in this case, in part, because Mother completed her services in the prior case but later behaved in a way that endangered her children and refused to accept responsibility for her conduct.

*Plans for Children and Stability of the Home*

In her brief, Mother highlights that the children's therapist stated that it would be ideal for the children to be placed together because the children improved more when they were together. In addition, Mother's parenting coach described Mother's home as safe and appropriate for the children and stated that the children's bedrooms at Mother's home had all the items that they would need and that she would have no concerns if the children were returned to Mother's care. Similarly, the Department's visit supervisor testified that she had no concerns regarding Mother keeping the children safe, and Mother's counselor testified that she did not have any concerns about Mother protecting her children.

Although the children's therapist did explain that keeping the children together would be ideal, the therapist also expressed concerns about the possibility of Leon and Sam being returned to Mother's care and recommended that Foster Parents adopt all four children if that were possible because they provide for the children's medical, educational, and emotional needs and provide a loving and stable environment that will benefit the children. The CASA also expressed concerns about the stability of Mother's home and stated that Foster Parents provide a stable home and take care of the children's needs and that the children have bonded with them.

The Department investigator testified that the children should not live with Mother because of Mother's prior history of drug use and history of engaging in endangering

26

behavior warranting the Department's involvement, and the caseworker explained that the Department changed its reunification goal after Mother tested positive for drugs multiple times during the pendency of the case. Further, the caseworker testified that it was in Sam's best interest to be adopted by Foster Parents and that since Leon's placement with Foster Parents, he has been able to begin processing his prior trauma because he is in a home in which he feels safe. In her testimony, Foster Mom discussed the efforts that she and her husband undertook to provide the children a safe home and stated that she and her husband have bonded with the children and provided rooms for the children that meet their needs. Further, Foster Mom expressed her desire to adopt all of the children or serve as a long-term placement for them. *Cf. Hann v. Texas Dep't of Protective & Regul. Servs.*, 969 S.W.2d 77, 83 (Tex. App.—El Paso 1998, pet. denied) (observing that "establishing a stable, permanent home for a child is a compelling interest for the government"), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 & n.39 (Tex. 2002).

*Mother's Actions Indicating Improper Parent-Child Relationship*

When addressing this factor, Mother notes that the prior cases involving the Department concluded after she successfully finished her services. Additionally, Mother emphasizes that the allegations of abuse concerned incidents that occurred before this case started and before she learned better ways to parent her children through her required services. Moreover, Mother mentions that no allegations of abuse were made before the children started living with Foster Parents. In addition, Mother challenges the Department's evidence concerning her alleged drug use during the pendency of the case and argues that even if she tested positive for drugs a few times during the twenty months that she was being tested, that should not be

27

enough to conclude that termination was in the children's best interest. Further, Mother emphasizes that her parenting coach and counselor testified regarding how she had learned better parenting practices during this case, which she asserts is the most direct evidence of what her parenting will be like in the future.

As set out previously, evidence was presented regarding Mother's extensive history of drug use prior to the children's removal and regarding her testing positive for drugs during the pendency of this case. *Cf. In re K.M.R.*, No. 14-17-00651-CV, 2018 WL 614762, at *12 (Tex. App.—Houston [14th Dist.] Jan. 30, 2018, pet. denied) (mem. op.) ("As sole arbiter of credibility and demeanor, the trial court was free to credit positive test results over Father's denial of cocaine use"). In addition, the psychologist to whom the Department initially referred Mother for an assessment testified that Lisa stated that Mother physically and psychologically abused her, forced her to watch Mother have sexual intercourse, and gave her marijuana to smoke, and Lisa's individual counselor discussed acts of physical abuse by Mother against Lisa. *Cf. In re E.A.G.*, 373 S.W.3d 129, 143 (Tex. App.—San Antonio 2012, pet. denied) (explaining that "a parent's abuse of other children in the home can support a finding of endangerment"). The psychologist also testified that Sam described being hit with a belt, which left marks on his body. The children's therapist and the CASA discussed how Sam and Leon described being physically abused by Mother. The CASA and Foster Mom discussed how Mother physically abused Sam, had sexual intercourse in front of him, and smoked marijuana with him. In addition, Foster Mom described how Lisa mentioned that Mother forced her to take photos of Mother naked. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (explaining that factfinder may make inferences from past conduct endangering well-being of child when making best-interest determination).

28

Viewing all the evidence in the light most favorable to the trial court's decree, we conclude that a fact finder could have formed a firm belief or conviction that termination of Mother's parental rights is in the best interest of Sam and Leon. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the best-interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in their best interest. Accordingly, after considering the relevant factors under the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship was in Sam and Leon's best interest.[5]

For these reasons, we overrule Mother's first issue on appeal.

**Endangerment**

In her second issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's conclusion that she engaged in conduct listed as a statutory ground for termination. The statutory predicate ground at issue in this case specifies that a trial court may terminate an individual's parental rights if the person "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D). "In this context, 'endanger,' means 'to expose to loss or injury, to jeopardize.'" *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (quoting

---

[5] In her brief, Mother also points to statements by the trial court questioning the sufficiency of the evidence before making its ultimate ruling. Although the trial court did indicate that the termination decisions were close ones, it ultimately terminated Mother's parental rights to two of her children, indicating that it concluded that the evidence was sufficient.

*In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)).  "Endangerment encompasses 'more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment,' but it is not necessary that the conduct was directed at the child or that the child actually suffered injury." *Id.* (quoting *In re M.C.*, 917 S.W.2d at 269).

Although subsection (D) focuses on the child's physical environment, "the environment produced by the conduct of the parent[] bears on the determination of whether the child's surroundings threaten his well-being."  *Id.* (quoting *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.)).  "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."  *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).  Evidence regarding domestic violence is relevant to an endangerment determination even if the violence is not perpetrated against the child.  *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.).  Similarly, evidence regarding a child being exposed to the sexual activity of the parent is relevant to an endangerment determination.  *See Ayala v. Texas Dep't of Fam. & Protective Servs.*, No. 03-09-00121-CV, 2010 WL 3672351, at *5 (Tex. App.—Austin Sept. 16, 2010, no pet.) (mem. op.).  When determining whether a child's surroundings endangered his well-being, courts may consider a parent's history of drug use, *see In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.), and may also consider whether the child has been exposed to drugs, *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *5 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.).

30

When challenging the sufficiency of the evidence, Mother highlights the evidence indicating that she complied with the services that were required for family reunification.[6] Further, Mother emphasizes the testimony from her counselor, her parenting coach, and the Department's visit supervisor who testified regarding Mother's improved parenting and indicated that they did not have any safety concerns about the children being returned to Mother's custody. Additionally, Mother notes that although the caseworker testified that Mother did not complete substance-abuse treatment, neither of the substance-abuse assessments to which she submitted recommended treatment, and she argues that the evidence regarding her drug use after her children were removed likely stemmed from a false positive result because she tested negative in subsequent tests. Accordingly, Mother argues that the evidence established that the endangerment concerns by the Department had been alleviated.[7]

---

[6] Regarding the caseworker's testimony that Mother did not complete all of her services, Mother contends that the trial court found that the caseworker was not credible. During the hearing, the trial court did state that caseworkers not providing all the necessary information to all parties and not keeping reunification as the primary goal undermines the process and causes a trial court to question the evidence that the Department presents, and the trial court did specify its concerns that this may have happened in this case; however, the trial court did not make any express credibility determination regarding the caseworker's testimony.

[7] In this issue and in the prior one, Mother argues that the evidence could not be sufficient because the trial court allowed two of the siblings—John and Lucy—to remain in Mother's custody even though the evidence regarding all four children was similar in nature and because the trial court required that the siblings have regular contact, which would result in the children for whom Mother's rights were terminated having contact with Mother. Although the trial court heard evidence regarding all four children, some evidence regarding Sam and Leon differed from the evidence pertaining to the other children. *Cf. In re T.C.*, No. 05-19-00262-CV, 2019 WL 3852657, at *8 n.9 (Tex. App.—Dallas Aug. 16, 2019, pet. denied) (mem. op.) (rejecting argument that "because the trial court did not conclude the evidence required termination as to all six children, the evidence was legally or factually insufficient to support termination as to any of them"). In addition to the evidence regarding Sam and Leon's desire not to live with Mother, evidence was presented regarding specific instances of physical abuse that Mother inflicted on Leon and Sam and regarding how the trauma of those events resulted in mental-health issues. Further, evidence was introduced indicating that Mother had sexual intercourse while Sam was

However, although Mother denied it, evidence was presented that Mother had physically abused both Leon and Sam, engaged in inappropriate sexual behavior in Sam's presence more than once, and gave illegal drugs to Sam and at least one of his siblings. Moreover, Mother admitted to being in a long-term abusive relationship with the father of three of her children. Further, testimony from the children's therapist indicated that the abuse that Sam and Leon suffered caused them to have mental-health issues. In addition, evidence was introduced regarding Mother's history of using illegal drugs while the children were in her care and her testing positive for drugs.

Additionally, evidence was presented that the children were removed from Mother's custody by the Department prior to this case and that she completed her services to obtain the return of the children but that she subsequently engaged in the endangering conduct that resulted in their removal in this case. *Cf. In re D.O.*, 338 S.W.3d 29, 34 (Tex. App.—Eastland 2011, no pet.) (noting in endangerment analysis "that the Department has conducted numerous investigations" of parents "over the years"). Finally, several witnesses testified that Mother placed her children in the care of inappropriate caregivers. *See In re M.D.*, No. 02-14-00305-CV, 2015 WL 729506, at *4 (Tex. App.—Fort Worth Feb. 19, 2015, no pet.) (mem. op.) (emphasizing in sufficiency review of endangerment finding that parent placed children "'with inappropriate caregivers on several occasions'").

Viewing all the evidence in the light most favorable to the trial court's decree, we conclude that a fact finder could have formed a firm belief or conviction that Mother knowingly

in the bed with her on multiple occasions and that Mother gave Sam marijuana. Moreover, although the trial court did order that the siblings have regular visits, the trial court explained that this was for the benefit of the children and not for allowing Mother to visit with Sam and Leon.

placed or allowed Sam and Leon to remain in conditions or surroundings that endangered their well-being. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the best-interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that Mother knowingly placed or allowed Sam and Leon to remain in conditions or surroundings that endangered their well-being. Accordingly, after considering the relevant factors under the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's endangerment determination.

For these reasons, we overrule Mother's second issue on appeal.

## CONCLUSION

Having overruled both of Mother's issues on appeal, we affirm the trial court's decree terminating her parental rights to Sam and Leon.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed: January 6, 2022